FILED
JUN 2 5 2007
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| GENOVEVA MORALES, ET AL | § § § | |
| v. | § | Civil No. DR-70-CA-14 |
| E.P. SHANNON, ET AL | § § | |

## MOTION TO DISMISS OR, ALTERNATIVELY, FOR MODIFICATION OF DECREE

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Uvalde Consolidated Independent School District ("the School District") makes and files this Motion for the dismissal of this lawsuit and an Order releasing the School District from further oversight or supervision by this Court. Alternatively, the School District seeks an Order modifying, in part, the Decree entered in this case in June, 1976 as amended; and as grounds therefor would show the Court the following:

### . BACKGROUND

1.  This suit was filed in 1970 during a time of significant political unrest in South Texas generally and in the Uvalde – Crystal City area specifically. The suit was brought by Ms. Morales as a class action on behalf of the Mexican American students in the School District. The Plaintiff alleged that while Mexican Americans had not been segregated in schools by law, as in the case of Blacks, they had been segregated in fact in the operation of the School District and thereby discriminated

1

against in violation of their basic constitutional rights. At the time of filing, the law was in a state of flux with regard to the obligations of a School District to remedy racial or ethnic imbalance that had not previously been mandated by law. The U.S. Supreme Court had not yet written on the subject.

2. The trial of this case was conducted before the Honorable John Wood Jr. in 1973 and resulted in findings by Judge Wood, contained in a detailed 20 page opinion, in which he concluded that the School District had not denied the constitutional rights of the Mexican American students in Uvalde and thereby denied all relief to the Plaintiff (366 Fed Supp. 813 (D.C. TEX. 1973).

3. The Plaintiff's perfected an appeal from Judge Woods' Decision with the result that the Court of Appeals for the Fifth Circuit reversed, holding that the evidence was not sufficient to support Judge Wood's finding of no discrimination in student assignment and remanded the case for the structure and implementation of a Desegregation Decree (516 F 2nd 411, [5th Cir. 1975]).

4. Upon remand, the School District and the Plaintiffs submitted competing Desegregation Plans. Inasmuch as there had never been but one high school and one junior high school in the School District, it was the attendance plan for the elementary schools that was at issue. Prior to the filing of the lawsuit, the elementary students were required to attend the school located in their zone; with four zones having been in place since about 1966. The School District's Plan called for all of the elementary students to attend a school housing only one or two grades. That way, there was

2

instant "integration" in each elementary school inasmuch as all elementary students in the same grade attended the same school. The School District's Plan also provided for transportation of the students in accordance with the regulations of the Texas Education Agency and assignment of teachers to classrooms on a "blind draw" basis in order to ensure against a disproportionate number of students of one ethnicity being assigned to a teacher of their own ethnicity.

5. After hearing the competing arguments of the parties, Judge Wood adopted the School District's proposed plan and entered an Order on June 28, 1976. Specifically in two instances in Judge Wood's Order, he found that the Plan "will suffice to convert the School District to a unitary school district" and "that upon implementation of this Plan, the Uvalde Consolidated Independent School District shall have been converted to a unitary system". The Decree also directed the School District to file annual reports providing statistical information with regard to the operation of the School District and its compliance with the Decree. The Court went on to retain jurisdiction of the case for all purposes including the entry of any further orders for the purpose of enforcing or modifying the Court's decree. No appeal was taken by any party from that Decree and it therefore became final as a matter of law in 1976.

6. Following the entry of the 1976 decree, the School District religiously complied with all of its provisions and operated the school system strictly in accordance with those provisions.

7. By 1995 it became apparent that the elementary scholastic assignment plan was educationally deficient. In September 1992, the Texas Education Agency had notified the School District that it had determined that the School District was not meeting State standards and had fallen into the lowest quartile in three of the four categories by which all school districts are reviewed by the State. In light of those concerns the School District staff set about investigating alternatives to the student assignment Plan and determined that it should reinstate a "neighborhood" school pupil assignment plan. At the core of that determination was the fact that at that time, out of the 3650 elementary campuses in Texas, only 8 housed a single grade and of that 8, three were in Uvalde.

8. The School District then identified zones for the four elementary schools which essentially encompassed the neighborhoods surrounding those schools and determined that the implementation of such a zoning plan would not significantly alter the ethnic ratios found in those schools in the previous year. The School District thereupon filed its Motion for Modification of the Decree to allow for the implementation of a neighborhood school zoning plan for the elementary schools. This motion was filed in January 1995. As of that time, neither the Plaintiffs in the lawsuit nor the United States Department of Justice that was receiving annual reports from the School District, had raised any question or made any objection whatsoever relative to the implementation of the 1976 Desegregation Decree since its imposition almost 20 years earlier.

9. By 1995, the Plaintiffs were represented in this case by attorneys on the staff of the Mexican American Legal Defense Fund ("MALDEF"). Those attorneys were provided with the School District's Motion for Modification of the Decree and thereafter participated in conferences with counsel for the School District and the Court and, as a result, filed no formal objection to the School District's Motion and it was thereafter granted by Order dated May 5, 1995, signed by Judge Fred Biery.

10. During the pendency of the lawsuit and before the original judgment was entered in 1973, the School District consolidated with the Batesville School District. Batesville is a small community located about 20 miles from Uvalde and had historically operated as a separate district having only one school. The School District agreed to acquire Batesville and undertake the obligation to operate that school as part of the Uvalde district. From that point forward all high school students in Batesville attended the junior high school in Uvalde. Students in K through 8th continued to attend the Batesville School. That arrangement was not changed by the 1975 Plan or the 1995 amendment.

11. In 2002, the School District determined that the 7th and 8th grade students in Batesville would be better served if they could attend the Uvalde Junior High. Accordingly, the School District filed a Second Motion to Modify the Desegregation Decree in July, 2002, which was unopposed by MALDEF or anyone else. Accordingly, the Court entered an Order granting the School District's Motion for Modification. That Order authorized the School District to implement the Uvalde

Regional School District of Choice Plan which would, *inter alia,* allow the 7th and 8th grade students at the Batesville School to attend the Uvalde Junior High School. The Judge specifically provided that his Order was an Interim Order in order to allow the Plaintiff to raise any concerns or complaints about the new plan and file a motion for "re-evaluation". No such complaints have been raised in the five years since the entry of that Order.

## RELIEF SOUGHT

12. At no time since the entry of the original Desegregation Plan have the Plaintiffs either through their original attorneys or through MALDEF filed any complaint with the Court that the School District was not complying with the Desegregation Plan either as originally implemented or as modified in 1995 and in 2000. The same thing is true with regard to the United Stated Department of Justice which, though never a party to this lawsuit, has received the annual reports of the School District historically. It follows therefor that there has never been any suggestion that the School District has not operated in utmost good faith under its Desegregation Plan. It is apparent therefor that true to the findings of Judge Wood in 1975, the Plan did "suffice to convert the School District to a unitary school district." This, of course, is the goal of all school districts operating under a Desegregation Plan and Uvalde has more than achieved that goal.

13. The fact that the School District's adherence to the Plan has resulted in its achievement of unitary status is most amply shown in the statistics. At the time

this suit was filed, the District was made up of 3853 students of whom 61% were Mexican-American, 38.6 were Anglo and .4% were Black. Furthermore, the Mexican-American percentage of the elementary students in each of the four elementary schools were: Dalton – 35%, Benson – 55%, Anthon – 98% and Robb – 97%. The faculty Mexican-American ethnicity was: high school – 20%, junior high school – 10%, Robb – 9%, Dalton – 6%, Benson – 10% and Anthon – 14% (366 F. Supp. at 816).

14.     As of the 2006-2007 school years, the demographics of the District had changed significantly and it had grown to 5135 students; an increase of 33%. The breakdown of the student enrollment of the entire District was 87% Hispanic, 13% Anglo and a minuscule percentage of Blacks and Asian Americans. Of the total 1397 elementary students, 90% are Mexican American and they were evenly distributed among the elementary schools as follows: Anthon – 88.93%; Benson – 90.3%; Dalton – 90%; and Robb – 88.9%. As of the 2006-2007 school year, the District employed 42.7% Hispanic teachers and 57.3% Anglo and "others" in the faculty, district-wide. The percentage of Hispanic teachers has progressively grown since the implementation of the original Plan. This increase has been especially significant in the elementary schools. At the time the suit was filed in 1970, the percentage of Mexican American teachers in the elementary schools ranged from a high of 14% to a low of 6% (366 F. Supp. at 816). After the implementation of the amended plan approved by the Court in 1995, the percentage of Mexican American teachers in the

7

elementary schools was: Dalton – 29%, Anthon – 37%, Benson – 43% and Robb – 29%. This represented an increase of 20-30% in Mexican American teachers in those schools in the 20 year intervening period. Since 1995, those increases have continued. Presently the Mexican American teacher percentages in the elementary schools are Dalton – 47.6%, Benson 68.7%, Anthon 42.4%, and Robb 48.5%. The governance of the District has likewise changed significantly to reflect the positive community attitude toward the operation of a unitary school system. At the time of the original filing of this lawsuit in 1970, no Mexican American had been elected to the school board since the District's founding in 1907. Today the 7 member Board has 3 Mexican American members. Mexican Americans have been serving on the School Board for several years.

15.   The basis of the opinion of the Fifth Circuit in this case which mandated the imposition of a Desegregation Plan was that while the Mexican American elementary population represented about 61% in the elementary schools, two of those schools reflected 95.9% and 97.2% Mexican Americans respectively; a gross disparity from the overall student body ethnicity. That problem has now been totally eliminated and has been for several years. As shown above, 90% of the elementary students are Mexican American. In the elementary schools the Mexican American ethnic population ranges from 90.3% to 88.9% a variation of less than 2%. Accordingly, it is clear that the School District has satisfactorily and in good faith complied with the remedial provisions of this Court's orders, as well as applicable

8

federal law and is entitled to declaration of unitary status. As stated by the United States Supreme Court in one of the most recent opinions concerning a school district's achievement of unitary status, the Court made clear the task of the District Court in cases such as this:

> On remand, the District Court must bear in mind that its end purpose is not only "to remedy the violation" to the extent practicable, but also "**to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.**"[1]

Those quoted portions of this statement from *Missouri v. Jenkins* come from the Court's opinion in *Freeman v. Pitts*, 503 U.S. 467, 489 (1992).

16.   The sole basis of the Fifth Circuit's reversal in this case was the disparity in the ethnicity of the students in the elementary schools. Based upon those figures, the Court held that Judge Wood's finding of no discrimination was clearly erroneous. It is important to note however that the Fifth Circuit did not reverse the case on the basis of the other points put forth by the Plaintiffs. The Court affirmed Judge Wood's finding that the use of ability groupings was not discriminatory and remanded the issues concerning bilingual-bicultural education and teacher and staff hiring for further consideration by the trial Court. There can be no legitimate argument now that the student assignments in the elementary schools reflect any vestige of discrimination against Mexican Americans. They represent about 90% of the student body in each of

---

[1] *Missouri v. Jenkins*, 515 U.S. 70, 102 (1995)

the elementary schools. The time has long since come that the control of this School District be restored to the state and local authorities.

## ALTERNATIVE RELIEF

17. The School District has now determined that it would be educationally preferable if all of the 7th and 8th grade students in Batesville attend Uvalde Junior High for a variety of reasons not the least of which is the inefficiency of operating 7th and 8th grades in two separate school locations. Furthermore at the close of the 2006-2007 school year, there were only about 40 7th and 8th grade students attending school in Batesville. Accordingly the School District intends to cease offering 7th and 8th grades at Batesville and directing all of those students to attend Uvalde Junior High in the future.

18. The School District believes that the 2002 amendment to the Plan provides it with the authority to direct all 7th and 8th grade students at Batesville to attend the Uvalde Junior High without the necessity or approval of this Court. However, MALDEF has suggested that the 2002 Order only <u>allowed</u> the 7th and 8th students to attend Uvalde Junior High rather than <u>mandated</u> that they do so. Accordingly, it is only out of an abundance of caution that the School District makes this application to the Court for that modification of the Plan in the event that the Court does not agree to dismiss the lawsuit altogether.

19. The purpose of reorganizing the Batesville campus in this way is to expand the academic, extra curricular and social opportunities of those students and at

the same time making a transition for those students to Uvalde much easier for them. The Uvalde Junior High offers Pre-Advanced placement courses in each of the core academic subjects that are not offered at Batesville. These courses serve as a foundation for college readiness. Furthermore, there are courses available at Uvalde Junior High in the fine arts, computer courses and vocational courses as well as a more viable athletic program that cannot be provided in Batesville. It is not practical to offer these programs at Batesville because there are so few students in the 7th and 8th grades; about 20 in each grade. As part of the District's plan in this regard, it has agreed to provide a liaison for all Batesville students moving to Uvalde to assist with their transition.

20. In the event that the Court does not choose to totally dismiss this case; in recognition of Uvalde having achieved unitary status, it is respectfully and alternatively requested that the Court approve an amendment to the Plan whereby all 7th and 8th grade students in the Batesville School will be assigned to Uvalde Junior High beginning in the 2007-2008 school year. It was only until quite recently that the School District determined to file this Motion and has done so principally by reason of an informal complaint lodged with it by MALDEF. The 2007-2008 school year will begin in late August of 2007. Accordingly, the School District respectfully requests a decision from the Court in time to implement the Batesville provisions in the event that the Court has not, by that time, ruled on the Motion to Dismiss the lawsuit. It is respectfully suggested that if the Court does not rule on the Motion to Dismiss the

lawsuit before school starts that the Court, at the very least, approve on an interim basis, the transfer of the 7th and 8th grade students from Batesville to Uvalde Junior High School.

WHEREFORE, Premises Considered, the Uvalde Consolidated Independent School District respectfully requests that upon notice and hearing, conducted as soon as possible, the Court dismiss this case and totally restore the operations of this School District to its Board of Trustees. Alternatively and only in the event that the Court does not dismiss this case now, it is respectfully requested that the Court approve the Plan already approved by the School District's Board of Trustees to require all Batesville 7th and 8th grade students (the same as is required of the Uvalde students) to attend Uvalde Junior High, and for such other and further relief to which this Defendant may show itself justly entitled either at law or in equity.

Respectfully submitted,

THE COOK LAW FIRM

By: _____
Grant Cook
State Bar No. 04732000
5005 Riverway, Suite 210
Houston, Texas 77056
(713) 552.0700
(713) 552.1610 Fax

ATTORNEY OF RECORD FOR
Uvalde Consolidated Independent
School District

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion has been sent to the attorneys of record for the plaintiff by Federal Express this __22__ day of June, 2007.

_____
Grant Cook