IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GENOVEVA MORALES, ET AL., | § | |
|     Plaintiffs | § | |
| | § | |
| v. | § | DR-70-CA-14 |
| | § | |
| E.P. SHANNON, ET AL., | § | |
|     Defendants | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**Introduction**

Now come Genoveva Morales, *et al.*, Plaintiffs in this class action, and file this response to the Motion to Dismiss filed by the Uvalde Consolidated Independent School District, *et al.*, ("Defendants" or "the District").[1] On June 28, 1976, this Court ordered Defendants to comply with a desegregation decree and plan in order to remove the vestiges of discrimination from the District. Without presenting any evidence of compliance and only partial, insufficient, and uncorroborated evidence on the eradication of the vestiges of discrimination, Defendants now ask the Court to withdraw its supervision. Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss and order Defendants to comply in good faith with the desegregation plan and eliminate the vestiges of discrimination to the extent practicable—as required by decades of case law.

**Statement of Facts**

Prior to 1954, many school districts throughout the United States offered inferior public education to many students based solely on their race, ethnicity, national origin, or other

---

[1] Plaintiffs filed a separate response to Defendants' Alternative Motion for Modification, regarding the proposed transfer of Batesville seventh and eighth grade students to Uvalde Junior High School, on July 6, 2007. *See* Dkt. No. 114.

protected status. *See Brown v. Bd. of Educ.,* 347 U.S. 483 (1954). Uvalde CISD was one of those districts that discriminated against students by creating two separate elementary schools for Mexican-American children, East Garden and West Garden. *Morales v. Shannon*, 516 F.2d 411 (1975) *cert. denied,* 423 U.S. 1034 (1976). In 1954, the United States Supreme Court declared that racial segregation in public schools is unconstitutional. *Id.* In the face of widespread non-compliance with its ruling in *Brown v. Board,* the Supreme Court ordered the school districts in that litigation to desegregate "with all deliberate speed." *See Brown v. Bd. of Educ.,* 349 U.S. 294, 301 (1955) (*Brown II*).

In 1968, because many school districts continued to defy the mandate to desegregate their schools, the Supreme Court stated "the time for mere 'deliberate speed' has run out," and declared that recalcitrant districts must institute a plan that "promises realistically to work, and promises realistically to work *now*." *Green v. Count School Bd. of New Kent County,* 391 U.S. 430, 437-38 (1968) (emphasis in original). Many school districts began the process to immediately desegregate their schools but others continued to defy the Supreme Court's decision and the United States Constitution. Defendant Uvalde CISD was among those districts that continued to operate a separate and unequal school system based on a student's race, ethnicity, or national origin. *See generally Morales,* 516 F.2d 411. As a result of Defendants' decision to continue to deny Latino students of their rights, Plaintiffs instituted this class action in 1970 challenging the District's failure to provide equal educational opportunities to Mexican-American schoolchildren and to English Language Learner students ("ELL students").[2]

In 1975, the Fifth Circuit reversed, in part, a decision by the district court and found strong evidence of segregatory intent in Uvalde's public school system against Mexican-

---

[2] English Language Learner students are also known and classified as students identified with limited-English proficiency ("LEP Students") under state law. *See* TEX. EDUC. CODE §29.052. The terms are used interchangeably throughout the brief.

American schoolchildren.[3]  *Id.* at 413.  The Fifth Circuit's opinion was partially based on the neighborhood assignment of students to the Robb and Anthon elementary schools, which had merely *replaced* the two prior Mexican schools of East Garden and West Garden.  *Id.*  The Fifth Circuit found that the neighborhood assignment system, coupled with the District's "freedom of choice" plan,[4] merely perpetuated the intentional segregation of Latino students originally caused by the establishment of Mexican schools.  *Id.*

On June 28, 1976, this Court entered a desegregation decree.  *See* Decree, Dkt. No. 59. The decree addressed many issues including:  student assignments; principals, faculty, staff and aide assignments, hiring, and reductions; programs for English Language Learner students; classroom assignments; transportation; facilities; and annual reporting requirements.  *Id.*  The Court directed the implementation of the District's proposed desegregation plan, and the bilingual-bicultural program for the ELL students, to assist in carrying out the mandates under the decree.  *Id.*  As the Court professed, the *implementation* of the desegregation plan and the bilingual-bicultural education program "will suffice to convert the School District to a unitary school district."  *Id.*

In 1995, Defendants filed their first Motion for Modification of the Decree in which they sought Court approval not only to modify the student assignment plan in the elementary schools, but also to incorporate a plan addressing quality of education issues for minority children in the District. Defendants recognized the need to address quality of education issues in the desegregation plan, due in part to the poor academic performance of its minority students.  *See* Defs.' First Mot. for Modification, UCISD Proposed Elementary Grade Arrangement for 1995-

---

[3] Plaintiffs refer to Mexican-American students as Latino students in this brief.  The State of Texas refers to Latino students as Hispanic students.
[4] As the Court pointed out, the freedom of choice plan resulted in 154 Anglo students selecting the predominantly Anglo school, Dalton Elementary.  *Id.*

3

96, Ex. 8 at 1; App.- Ex. P-1 ("1995 Plan").  The parties agreed to incorporate the grade arrangement plan into the desegregation plan, and also agreed to include additional reporting requirements for the District. *See id.* at Ex. 7, Supplement to Desegregation Order in Morales v. Shannon; attached to App.- Ex. P-2.  The Court granted that motion and modified the plan accordingly. *See* Order dated May 5, 1995.

In July 2002, the District filed its Second Motion for Modification of the Decree.[5]  In the motion, the District requested the implementation of a School District of Choice Program. Among other obligations under the Choice Program, the District would develop a special curricula program at the Batesville School and allow students from Uvalde to attend the Batesville School and students from Batesville to attend the Uvalde schools. *See* Dkt. No. 97. The motion was granted and the Court subsequently amended the plan a second time.

On June 5, 2007, Plaintiffs sent to Defendants a letter inquiring about the District's decision to transfer all seventh and eighth grade students from the Batesville School to Uvalde Junior High, and whether the District intended to seek court approval for the transfer. *See* Letter to District, App.- Ex. P-3.  Plaintiffs also requested that the District forward copies of the District's Annual Report for the last 3 years.  The District responded by stating that the Batesville transfer issue did not require court approval.  *See* Letter from Cook, June 15, 2007; App.- Ex. P-4.  After a second request by Plaintiffs for documents related to the Batesville transfer and for a complete Annual Report, Plaintiffs instead received the pending motion to dismiss from Defendants without any notice from the District.[6]  Defendants now ask for dismissal from the court's jurisdiction altogether, based primarily on the mere passage of time

---

[5] Plaintiffs' argument related to the Batesville School transfer issue is addressed in their response to the District's second motion to modify and is fully incorporated herein. *See* Dkt. No. 114.

[6] Plaintiffs also received from Defendants an amended annual report from the District, but as explained below, this too did not meet the Court's Order.

4

and the changing demographics.[7] However, as explained below, such overly broad, unsupported assertions do not satisfy their burden to support dismissal of the Court's order.

## Argument

The goal of a school desegregation plan has been defined as the transition from a dual system to a unitary, nonracial system of public education. *Green*, 391 U.S. at 436. In order for a court to determine whether it should discontinue judicial oversight, two central questions must be addressed by the movant: 1) whether the defendant school district "ha[s] complied in good faith with the desegregation decree since it was entered;" and 2) "whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Frazar v. Ladd*, 457 F.3d 432, 439 (5th Cir. 2006) (citing *Freeman v. Pitts*, 503 U.S. 491-492 (1992)). Additionally, Defendants must demonstrate that retention of judicial control is unnecessary or impracticable to achieve compliance with the order in the various facets of the system and the district has demonstrated to the public and to the parents and the students of the once disfavored races a good faith commitment to the whole of the order and to those provisions of the law and the Constitution that laid the predicate for judicial intervention. *Freeman*, 503 U.S. at 491.

Defendants' motion should be denied because they fail to satisfy their burden of proving good faith compliance with the desegregation plan and the elimination of the vestiges of discrimination. Tellingly, Defendants provide virtually no evidence of compliance with the actual provisions of the desegregation plan. The vestiges of discrimination continue in the District through racially disparate student assignments to schools and classrooms, racially

---

[7] Defendants also allege Plaintiffs have never complained of the District's compliance over the last thirty years. *See* Defs.' Mot. to Dismiss at 6 ¶12. Although such "inaction" would be of no consequence in relieving Defendants of their burden in this case, complaints and official reports of the differing treatment of Latinos are well documented. *See, e.g.,* Memorandum of Agreement entered between LULAC and the District, App.- Ex. P-5; 1995 Plan, Ex. P-1 (referring to findings of 1992-93 TEA audit); 2001 Audit of Uvalde CISD, App.- Ex. P-6. (This exhibit is quite lengthy. For brevity purposes, Plaintiffs attach pages 63-150.) Plaintiffs also negotiated with Defendants issues related to the 1995 amended plan.

disparate faculty and staff assignments, student achievement gaps, and a failure to meet the special needs of ELL students. *See infra* § II. The District remains indifferent to correcting these problems, and, thus, the vestiges of past discrimination continue to disadvantage Latino students. The only evidence provided with respect to the *Green*-related factors (discussed *supra* § II) concerns student and teacher assignments to schools, and even that evidence is very limited in scope. Therefore, Plaintiffs urge the Court to deny Defendants' motion to dismiss.

## I. DEFENDANTS' FAIL TO CARRY THEIR BURDEN IN PROVING GOOD FAITH COMPLIANCE WITH THE DESEGREGATION ORDERS IN THIS CASE.

As stated above, a school district seeking dismissal of a desegregation order must show full and satisfactory compliance with the desegregation order. *Freeman v. Pitts*, 503 U.S. 467, 491 (1992). As the Supreme Court has held: "A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Id.* Defendants also continue to bear the "burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman v. Pitts*, 503 U.S. at 494.

### A. Defendants' Proffered Evidence of Compliance with the Desegregation Plan is Insufficient.

In the first instance, Defendants' motion should be denied because they have not satisfied their burden of proving good faith compliance with the plan. The only evidence Defendants presented to the Court in their motion to dismiss relates to unsubstantiated assertions concerning student and faculty assignments without any reference to supporting affidavits or other pertinent documents as required by the local rules. *See* L.R. 7(b).

Furthermore, Defendants sustained their burden in proving good faith compliance because the limited analysis of faculty and student assignments does not address all of the

schools in the district and focuses on only one year of school.  Additionally, Defendants fail to carry their burden with respect to all other facets of the desegregation decree and the desegregation plans in this case.  For instance, Defendants make no mention of compliance with the provisions concerning classroom assignments; principal, teacher, staff and aide assignments; extracurricular activities; facilities; transportation; and the bilingual-bicultural program for ELL students.

The District also failed to report its compliance with the 1995 amended desegregation plan.  For example, the 1995 Plan presented by Defendants established "Superintendent Goals" for improving student performance in the District.  *See* App.- Ex. P-1 at 8-9.  The goals included: improving the effectiveness of special programs such as bilingual and gifted and talented programs; improvement of parental involvement program; and addressing concerns identified by the Texas Education Agency.  *Id.*  The District has not presented one iota of evidence demonstrating compliance with this amendment to the desegregation plan.

### B. Other Available, Relevant Evidence Demonstrates Anything but Good Faith Compliance with the Decree.

Although Defendants have presented only limited data through the annual reports, Plaintiffs' review of other available, relevant evidence further demonstrates the District's lack of good faith compliance.  For example, Defendants' motive and practices involved with filing the subject motion evidences their lack of good faith compliance with the plans and orders of this Court.  The District failed to seek Court approval for the transfer of junior high students from the Batesville School to Uvalde Junior High School until Plaintiffs made a second demand for documentary evidence of the transfer.  *See supra* at 4.  Despite the clear language in the 2002 motion and order implicating the student assignment plan for all schools including the Batesville

School, Defendants stated in their motion, "it is only out of an abundance of caution that the School District makes this application to the Court. . ." *See* Defs.' Mot. to Dismiss at 10 ¶18.

Defendants also did not engage in any communication with the affected class of Latino parents and they did not present to the Latino community any substantive analysis of their compliance. *See* Decl. of J. Flores, July 18, 2007, App.- Ex. P-7. This does not fulfill the Districts' requirement to "demonstrate, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *See Freeman*, 503 U.S. at 491.

In fact, at least two elected Latino defendant board of trustee members did not even know of the District's decision to seek a motion to dismiss. *See* App.- Ex. P-7. As the Supreme Court has held, "[w]hen a school district has not demonstrated good faith under a comprehensive plan to remedy ongoing violations, we have without hesitation approved comprehensive and continued district court supervision." *Freeman*, 503 U.S. at 499 (citing *Columbus Bd. of Education v. Penick,* 443 U.S. 449, 461 (1979) (predicating liability in part on the finding that the school board " 'never actively set out to dismantle [the] dual system,')). Similarly, in this case, because Defendants have not provided any evidence addressing their good faith compliance with the obligations under the desegregation plan, Plaintiffs urge the Court to retain jurisdiction.

Defendants have also failed to produce Annual Reports in accordance with the Court's 1976 Decree and the supplemental order signed in 1995. *See* Decree; Supplement Order, App. Ex. P-2. Following Plaintiffs' request for the past three annual reports on June 5, 2007, Defendants first produced very limited data to Plaintiffs and the Court on June 12, 2007. *See* Statistical Report of the Uvalde CISD, Dkt. No. 108. Plaintiffs followed with a second request

on June 17, 2007 once again requesting the full annual report. *See* Letter to Cook, dated June 17, 2007, App.- Ex. P-6. Defendants responded by filing an amended report. *See* Status Report, Dkt. No. 109. Once again, Defendants failed to comply with the simple reporting requirement by sending limited data. For example, classroom assignment data, facilities information, and inter-district student transfer data was sent only for the year 2007 and not for the previous years. *Id.* Additionally, the District did not identify the districts for which inter-district transfers were allowed in the year 2007. The District also failed to wholly report the information required in the Supplemental Order for at least the last three years.[8]

In *Moses v. Washington Parish School Board,* the Fifth Circuit held that although a district subject to a desegregation order cannot change the past, "it must do what it can, in good faith, to eliminate the past vestiges of discrimination" by demonstrating "over a reasonable period of time, a good faith commitment to eliminating the vestiges of past discrimination and to make meaningful progress toward becoming a fully integrated non-discriminatory school with respect to all facets of its operation."  379 F.3d 319, 327 (5th Cir. 2004). In their motion, Defendants fail to establish whether the District: "did what it could;" "did so in good faith;" and "eliminated the past vestiges of discrimination." Since the District has failed to shoulder its burden and demonstrate good faith compliance with the desegregation plans, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

## II.  DEFENDANTS HAVE FAILED TO ERADICATE THE VESTIGES OF DISCRIMINATION.

Defendants have also failed to remove the vestiges of discrimination that still linger thirty years after the original decree was entered in this case. A vestige of past discrimination is "any

---

[8] In Defendants' Second Motion for Modification of Decree, they acknowledged the additional reporting requirements stating: "the parties, as of that Order (dated May 5, 1995) agreed to certain changes in the information required to be filed in the annual reports." Defs.' Second Motion at 3.

condition that is likely to convey the message of inferiority implicit in a policy of segregation." *Bd. Of Educ. Oklahoma City v. Dowell*, 498 U.S. 237, 260 (1991) (Marshall, J., dissenting). A decree of desegregation is not achieved "so long as these conditions persist." *Id.*

In *Green*, the Supreme Court identified six relevant factors for determining whether vestiges of discrimination remain in a school district. Those factors include: student assignments, faculty, staff, transportation, extracurricular activities and facilities. *Id.* at 435-436. These factors are by no means exhaustive and a court may also consider other relevant factors such as the quality of education available to the disfavored class of persons and other issues addressed in the desegregation decree and plan. *See Flax v. Potts*, 864 F.2d 1157, 1161 (5th Cir. 1989).

The fact that the District has only presented limited data to the Court and the parties regarding teacher and student assignments not only draws concern for those direct areas, but also draws concern for other *Green*-related factors. As the Supreme Court has recognized, "[t]wo or more *Green* factors may be intertwined or synergistic in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well." *Freeman*, 503 U.S. at 497. Therefore violations of one *Green* factor may support the need to remedy deficiencies in another area. *See id.* (citing *Bradley v. Richmond School Bd.*, 382 U.S. 103, 105 (1965) *(per curiam )* ("There is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans is entirely speculative") (additional citations omitted)). Many concerns about the continuing vestiges of discrimination and the lack of trust in the District from the community remain, emanating from the District's sheer neglect of its duties under the desegregation plans and order.

A.  **The District's Review of Student and Faculty Assignments is Insufficient and Incomplete to Sustain its Heavy Burden in Eradicating the Vestiges.**

1. Student Assignments

Defendants have not fully eliminated all racially identifiable schools to the extent practicable and in accordance with the Court's orders. As a result of this lapse, the vestiges of past discrimination remain in student assignments.

As of 2005-06, the number of Latino and white students at the Batesville School and at the Excel Academy was not proportionate to the population of the District. Since the 2001-02 school year, the percentage of Latino students in the District has slowly risen from 83.9% to 86.6% in 2005-2006.[9] The Anglo student population has marginally declined from 15.2% in 2001-2002 to 12.5% in 2005-2006.[10] In spite of these statistics, the Latino-Anglo population at Batesville Elementary School and the Middle School, and the Excel Academy, grossly deviated from the general population of the district.[11] The same is true for Batesville Middle School.[12]

Although Defendants have argued that the rest of the District is generally in compliance with student assignments, Defendants have failed to apply the desegregation order to *all* schools in the District. Partial compliance with the Order is analogous to granting students partial equal protection of the law. Accordingly, this court "need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future." *Bd.*

---

[9] *See* Uvalde CISD Summary of TEA AEIS Reports - Ethnic Distribution of Students, App.- Ex. P-9 (compiled from the Texas Education Agency's Academic Excellence Indicator System Reports, which can be accessed at www.tea.state.tx.us/perfreport/aeis/2006/index.html.
[10] *See id.*
[11] Batesville Elementary student assignments for Latino and Anglo students are as follows: (01/02) – 92.5% Latino, 7.5% Anglo, (02/03) – 92% Latino, 8% Anglo, (03/04) – 94.7% Latino, 5.3% Anglo, (04/05) – 98.4% Latino, 1.6% Anglo, (05/06) – 96.1% Latino, 3.9% Anglo. *Id.*
[12] Batesville Junior High student assignments for Latino and Anglo students are as follows: (01/02) – 96% Latino, 4% Anglo, (02/03) – 96.2% Latino, 3.8% Anglo, (03/04) – 96.1% Latino, 3.9% Anglo, (04/05) – 97.9% Latino, 2.1% Anglo, (05/06) – 96.7% Latino, 3.3% Anglo. *Id.*

*of Educ. of Oklahoma City v. Dowell,* 498 U.S. 237, 249 (1968).  Given the District's history of noncompliance, it is likely that the District will revert to its dual system.

    2. Faculty Assignments

The Supreme Court has held that the failure to racially allocate faculty denies students "equality of educational opportunity without regard to segregation of pupils." *Rogers v. Paul,* 382 U.S. 198, 200 (1965).  The District asserts that it no longer has racially identifiable schools according to its teacher assignments, but the District does not fully address teacher assignments at all schools and it does not cite the standard used by this Court.  *See* 1976 Decree at 4 (requiring that "the assignment ratio of Mexican-American to Anglo teachers in each school is (within 15%) the same as the ratio of Mexican-American to Anglo teachers through out the entire school system."  That ratio has not been maintained at all schools.

For example, in the 2005-06 school year, 51% of the teachers in the District were white. *See* Uvalde CISD Summary of TEA AEIS Reports- Ethnic Distribution of Teachers, App.- Ex. P-10.  However, both Flores and Benson Elementary Schools failed to fall within the 15% standard.  *Id.*  Flores Elementary was comprised of 33% Latino teachers and 67% white teachers and Benson Elementary was comprised of 65.5% Latino teachers and 34.5% white teachers.  *Id.* The Batesville School also fell out of compliance with the Court's order, with only 22.3% white teachers and 77.7% Latino teachers.  *Id*.

The percentage of minority faculty assignments is consistently disproportionate among the schools in the District and the racial imbalance indicates that vestiges of discrimination still persist.  This perpetuates the perception in the community that "White schools" and "Latino schools" still exist.  It also further evidences that the District is not in compliance with the

Decree. The elimination of a dual system is not achieved "so long such conditions persist." *Bd. Of Educ. of Oklahoma City*, 498 U.S. at 290.

### B. The Continuing Existence of Other *Green*-Related Vestiges not Examined by the District Indicates the District has not Fulfilled its Duties.

Perhaps most troubling, as stated above, is the fact that the District has not provided any evidence of its compliance with the Court's orders and plans and the removal of the vestiges of discrimination, with the exception of the limited, insufficient analysis of faculty and student assignments. There was no evidence concerning classroom assignments, transportation, extracurricular activities,[13] facilities, the bilingual-bicultural program; or the quality of education provisions in the 1995 amendment to the desegregation plan. Yet, the District still asks the Court to dismiss the case. Although a response is not in order since the District failed to address these factors, Plaintiffs provide a limited analysis of some of these factors based on available information.[14]

1. <u>Bilingual-Bicultural Program for English Language Learner Students</u>

In 1975, the Court of Appeals articulated the need for a comprehensive bilingual education program. "[A] bi-lingual education program is necessary to permit the Mexican-

---

[13] Although Defendants have not addressed extracurricular activities in their motion, an example of the inequities for Latino participation can be found in the attached article, "The Case of the Disappearing 'Brown Girls', describing how the junior varsity and varsity volleyball teams had no Latina players in 2003 (after having approximately 15 players in the previous year), as well as the Anglo coach's alleged reference to the Latina players as "*brown girls*." *See* Juan Sanchez, *The Case of the Disappearing Brown Girls*, La Voz de Uvalde County, Sept. 27, 2003 at 1, 4, App.- Ex. P-11; *see also* Juan Sanchez, *What Next- Correction or Cover-up?* La Voz de Uvalde County, May 30, 2003, App.- Ex. P-12 (indicating that 27% of the white student population was inducted into the Junior Honor Society versus 5% of the Latino student population.)

[14] In the event the Court is inclined not to deny the motion outright, Plaintiffs would request a necessary and reasonable opportunity to conduct discovery of relevant documents and persons, because the District failed to articulate good faith compliance and has not produced any evidence concerning most of these factors. Plaintiffs would further request a scheduling order and, if necessary, a final evidentiary hearing to present their case. Furthermore, should the Court be inclined to consider dismissing the case, at the very least a three-year monitoring period is required. *See Youngblood v. Bd. of Public Instruction* 448 F.2d 770 (1971); *U.S. v. Lawrence County School Dist*., 799 F.2d 1031, 1038 (5th Cir. 1986); *Tasby v. Moses*, 265 F.Supp.2d 757 ( N.D. Tex. 2003) ("A District Court is required to retain jurisdiction . . . for three years after finding it to be unitary, during which time the district is to submit annual reports to the Court." Dismissal is warranted only after complainants are given an opportunity in a hearing to demonstrate whether dismissal should be further delayed.))

American students to continue to develop intellectual capacity in Spanish while gradually becoming proficient in English." *Morales*, 516 at 414. Consequently, the desegregation decree provided that Defendants must provide a bilingual-bicultural program consistent with the plan. However, Defendants failed to even mention the program in their motion.

The available data concerning ELL students indicates Defendants are not complying with the desegregation plan and decree. Under federal and state law, students identified as limited in English proficiency are entitled to services to overcome language barriers. *See* Equal Educational Opportunities Act, 20 U.S.C. § 1703(f); TEX. EDUC. CODE § 29.051. At a minimum, Defendants must not only adopt a language program for LEP students based on a sound pedagogical theory and put that program into place with the appropriate practices, resources, and personnel, they must also follow up on the implementation of the program to insure that the program actually allows LEP students to overcome language barriers and allows them to participate equally in the educational programs. *Castaneda v. Pickard*, 648 F. 2d 989, 1010 (5th Cir. 1981). In Texas, the chosen educational program for any district with an enrollment of 20 or more ELL students in the same grade level in grades K-6 is a bilingual education or special language program. TEX. EDUC. CODE § 29.053. For secondary schools, English as a Second Language programs are generally required. *Id.*

During the 2005-06 school year, Uvalde enrolled 408 ELL students, but serviced only 316 ELL students through the Bilingual/ESL program. *See* TEA AEIS Uvalde CISD District Report, 2005-06, at §II at 1 (LEP Students) and 17 (Bilingual/ESL Enrollment); App.- Ex. P-13. The District then allocated a mere .3% of general fund budget, nearly one-fifteenth (1/15) of the statewide average of 4.3% for the Bilingual/ESL program. *Id.* §II at 6. Furthermore, comparing the budget allocation for the District's gifted and talented ("GT") education program the District

14

enrolled only 257 students in the GT program but still allocated the same .3% of its general fund budget to that enrichment program.[15] *Id.*

The District's lack of commitment to provide equal educational opportunities is further evidenced by the lack of teachers at the high school. At Uvalde High School, the District reported 61 students enrolled in the Bilingual/ESL Education program (out of 81 total ELL students), but there were no bilingual/ESL teachers listed in that program.[16] The lack of qualified, certified teachers at the high school level indicates a lack of compliance with the desegregation plan. Given the District's lack of commitment to provide equal educational opportunities to ELL students, not surprisingly, those students are performing miserably.

The ELL students' TAKS test scores fall far behind even the Latino students in the District. *Less than 1%* of the ELL students in grades 6-12 in the District met the minimum state standards for all of the 2006 TAKS tests.[17] *See* Ex. P-13 at §I, 2-4. The District's abysmal failure to meet the minimum needs of the ELL students was highlighted when the District was one of only twenty-one districts statewide to be cited by the Texas Education Agency in the 2006-07 school year and scheduled for an on-site review of its bilingual/ESL program. *See* list attached to Letter from TEA, dated Oct. 20, 2006; App.- Ex. P-16.

2. Quality of Education

The Supreme Court has acknowledged, "the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated." *Freeman*, 503 U.S. at 490. As stated previously, the District recognized the interrelation of quality of education issues for

---

[15] The actual figures reported for the two programs are: $80,127 for Bilingual/ESL Education; $71,068 for Gifted and Talented. *Id.*
[16] *See* TEA AEIS Uvalde High School Campus Report, 2005-06, at §I, 2, 4; App.- Ex. P-15.
[17] The figures for each grade can be found under the "All Tests" category.

Latino students and desegregation issues and adopted a plan to remedy the deficiencies. *See supra* at 4. The District also conveyed an interest in addressing the issues cited by TEA in 1992, which included an interest in correcting the average magnitude of the equity gap between the Latino and white students. *See* 1995 Plan, Ex. P-1 at 3. To address these concerns, the District set forth a plan of action, including increased accountability for student achievement and an increased focus on student needs. *See id.* at 1. The plan also stated that "[a]ll campus staff will be expected to reflect an attitude of high expectations for all student groups," and the indicator for student success would be identified by meeting specified Texas Assessment of Academic Skills (TAAS)[18] objectives in the areas of reading, writing, mathematics, science, and social studies. *Id.* at 31.

Six years later, in 2001, the District continued to struggle miserably in affording Latino students equal educational opportunities. The District retained the independent Texas Association of School Administrators ("TASA") to perform an audit of the District. The audit revealed a number of troubling findings concerning the treatment of Latino students. For example, the report cited larger-than-expected gaps in achievement between Latino and white students,[19] inequities in access for Latino students to GT and Advanced Placement classes, disparate treatment in disciplinary actions and disparate access to activities that "encourage students toward higher academic levels in high school. *See* Ex. P-6 at 63.

Despite the District's pronounced concern in 1995 and five years after the eye-opening audit by TASA, a marked disparity in achievement still exists in the state standardized test scores

---

[18] The TAAS is the former state standardized test for public school students. In 2002-03, it was replaced by the Texas Assessment of Knowledge and Skills ("TAKS") test. *See* http://www.tea.state.tx.us/student.assessment/taks/booklets/index.html.

[19] The audit stated: "While some variation in achievement is natural and therefore expected, gaps between Anglo and Hispanic students . . . are excessive and do not exist in an effective school district." *See* Uvalde CISD Audit Report at 70, Ex. P-6. The audit also criticized the District stating: "[l]ow expectations for the achievement of Hispanic . . . students were pervasive in interviews with school staff." *Id.* at 149.

of Anglos and Latinos in the District. Indeed, the achievement gap at the high school level is particularly striking, based on 2005-06 test data. Of all ninth grade students, only 35% of Latino students met the standard for all the TAKS tests, while 66% of Anglo students met the state standards. Ex. P-13 at §I, 3. The performance of Latino students in Uvalde CISD also falls behind that of Latino students statewide, in which ninth grade students scored 9 percentage points higher (46%) in meeting the state standards on all the TAKS tests. *See* TEA AEIS State Report, 2005-06, App.- Ex. P-14 at §I, 3. The tenth and eleventh grade students indicated the same, tragic pattern for Latino students in Uvalde CISD.[20]

In 2006, the Texas Education Agency notified the District that it would be subject to Stage 1 school improvement requirements because the District did not meet Adequate Yearly Progress under the No Child Left Behind Act for two consecutive years in Hispanic Math[21] This highlights the District's noncompliance with their obligations under the 1995 Plan. While the critical problem is not simply the achievement gap within District, it demonstrates a problem of racial and ethnic disparity in the District, as well as continuing noncompliance by the District.

### 3. Access to GT and AP Classes

The Court's order also required that the District not assign students to classrooms on the basis of their race, color or ethnic origin. *See* 1976 Decree at 4. The issue of access to gifted and talented programs was further integrated into the Court's plan by way of the 1995 modification. The District aimed to make a "Gifted and Talented program available for identified students." *See* App.- Ex. P-1. However, the District is tracking a significant percentage of white students

---

[20] Of all 10th grade students tested, only 21% of Latinos in the District met the state standard for all TAKS tests taken, while 59% of white students met the same standard. Ex. P-13 at §I, 3. Statewide, 36% of Latino students met the same standard. Ex. P-14 at §I, 4. Of all 11th grade students tested, only 40% of all Latino students in the District met the state standard for all TAKS tests taken, while 72% of all white students met state standards. Ex. P-13 at §I, 4. Statewide, 53% of Latino students met the same standard. Ex. P-14 at §I, 4.

[21] *See* App.- Ex. P-16, available at http://www.uvalde-cons.k12.tx.us/forms/notifications/ AYP%20Parent%20Letter.pdf.

into the advanced placement classes compared to Latino students. Of the students identified in the AP courses, 49% of the students in the AP courses are white, though white students only comprise 17% of the students in the high schools.[22]

Furthermore, in the TEA's AEIS reports for the schools in the District, none of the campuses list any Gifted and Talented teachers, although there are numerous students identified for the program. *See* Ex. P-13 at §II, 7. The District alleges that it has adhered and complied with its desegregation plan in good faith. Defs.' Mot. Dismiss at 6. However, the record shows otherwise.

### Conclusion

The District ignores its continuing obligations to operate in good faith under the plan and continues to perpetuate the existence of the vestiges of past discrimination. Therefore, judicial oversight must continue until the District Court finds that the District is "being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it [is] unlikely that the school board [will] return to its former ways." *Dowell*, 498 U.S. at 247. Accordingly, Plaintiffs respectfully urge the Court to deny Defendants' motion and to order further relief to ensure equal educational opportunities for Latino students in the District.

DATED: July 20, 2007                    Respectfully submitted,

                                        David G. Hinojosa
                                        State Bar No. 24010689
                                        Nina Perales
                                        Mexican American Legal Defense and
                                          Educational Fund, Inc. (MALDEF)
                                        110 Broadway, Suite 300
                                        San Antonio, TX 78205
                                        Tel.: (210) 224-5476/ Fax: (210) 224-5382

---

[22] *See* Uvalde High School AP Classes, based on 2006-07 Classroom data provided by Defendants. App.- Ex. P-18. This calculation excludes Spanish AP, which is traditionally a course attended by Latino students. Including Spanish AP, white students still account for 43% of the students in the AP courses.

By: David G. Hinojosa   /S/
David G. Hinojosa
Attorneys for Plaintiffs

**Certificate of Service**

I certify that a true copy of the aforementioned document was sent to the following by certified mail, return-receipt requested on July 20, 2007:

Grant Cook
5005 Riverway, Ste. 210
Houston, Texas 77056

By: David G. Hinojosa   /S/
David G. Hinojosa
Attorneys for Plaintiffs