UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

FILED

2007 AUG -3  AM II: 48

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| GENOVEVA MORALES, ET AL | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Civil No. DR-70-CA-14 |
| | § | |
| E.P. SHANNON, ET AL | § | |
| *Defendants* | § | |

## TRIAL BRIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Uvalde Consolidated Independent School District

("UCISD") and respectfully submits this Trial Brief as directed by the Court and as

grounds therefore which show the Court the following:

1.      At the conclusion of the evidentiary hearing in this case, the Court stated

that it saw that it had three options:

(1)     To grant UCISD's Motion for Modification and allow it to assign all 7th

and 8th grade students previously attending Batesville School to Uvalde

Junior High School;

(2)     To deny the Motion; leaving the Batesville School 7th and 8th grade

students in Batesville School with the choice to attend Uvalde Junior

High School; or

(3)     To "order an upgrade" of the Batesville School 7th and 8th grade

curriculum.

The Court requested briefing from the parties on those options.

2.      The Court also asked the parties to address: (1) the issues that the Court should consider in ruling upon this Motion to Amend a Desegregation Plan with an emphasis on 5th Circuit cases; and (2) the appealability of the Order that he enters on the Motion.  This Brief will undertake to address all of those issues.

PROPER SCOPE OF THE COURT'S REVIEW – THE ISSUES

3.      There is a dearth of authority of 5th Circuit cases specifically dealing with motions to amend desegregation plans; as opposed to applications to dismiss desegregation cases in their entirety.  Probably the most comprehensive case in point is *Tasby v. Wright*[1].  There Judge Sanders was confronted with an application by the Dallas school district to amend its desegregation plan in order to establish Educational Centers to which a substantial number of minority students from 9 different attendance zones would be assigned, and other changes including closing and consolidating several schools.  Judge Sanders initially set about to state the "established principles of school desegregation law"[2] to be utilized in deciding the motion to amend the plan.  The first such principle he stated was to inquire as to whether the amendment would have a detrimental effect on the school district's continuing affirmative duty to bring about the "maximum desegregation practically achievable"[3].  The second principle elucidated by Judge Sanders was that "the court

---

[1] 585 Fed. Supp. 453 (N. D. Tex. 1984)
[2] Id. at 254-255
[3] Id. at 255

must view the school district as a whole and not school-by-school; the goal is to cure

the continuing effects of the dual school system.  That is to say, it is the purpose of

school desegregation to make whole the victims of past unlawful discriminatory

practices"[4].  Judge Sanders concluded that litany by stating:

> It is also basic that in school desegregation, the district court has broad
> powers to establish equitable remedies.  Such remedies should
> accommodate the interest of school officials in administering school
> affairs consistent with the Constitution[5].

With regard to the substance of the issue presented in *Tasby*, the court found that the

minority students who would be assigned to the proposed Educational Centers had

extremely low achievement grades in their existing schools.  He found that the

district's proposal was being made in order to "address this crisis by providing these

students instruction more concentrated than is available at the 4-6 Centers which they

currently attend".[6]  In approving the proposed modification, the court found that none

of the requested changes would adversely affect, but would indeed benefit the

desegregation process.[7]  This is the same result that UCISD believes will occur if its

Motion is granted and the 7th and 8th grade students at Batesville School are assigned

to Uvalde Junior High where they will be afforded a broader curriculum and will be at

a more ethnically diverse campus.  Based on Judge Sanders' conclusions that the

school district's proposals were not inconsistent with the desegregation of the district

---

[4] Id.
[5] Id.
[6] Id. at 256
[7] Id. at 256-257

as a whole but indeed were a positive move toward district-wide desegregation, he granted the motion.

4.      In the case of *United States v. Hendry County School District*[8], the 5th Circuit reviewed an order of the district court granting an amendment to the plan of desegregation in order to allow the construction of a new school at a site selected by the school district.  The evidence showed that the new school would be located in a white community such that "one-way busing" of black children to it would result. Notwithstanding that evidence, the 5th Circuit affirmed the trial court's finding that the proposed construction was "constitutionally permissible and educationally sound". The standard set forth by the 5th Circuit there was simply stated as: "We cannot tolerate resegregation of a former dual school system and the school board of such a system must demonstrate that the new construction will not tend to promote such a relapse."[9]  Finding that the proposal would not result in any such "relapse", the 5th Circuit affirmed.

5.      In the early case of *Davis v. Board of School Commissions of Mobile County*[10], the court was faced with a request by the Mobile Alabama School District to amend its desegregation plan in order to build a new middle school and close a previously predominately black school.  The plaintiffs complained that the school to be closed was located in a predominately black residential area and the site selected

---

[8] 504 Fed. 2nd 550 (5th Circuit, 1974)
[9] Id. at 554
[10] 483 Fed. 2nd 1017 (5th Circuit 1973)

for the new school was in a predominately white residential area. The district court

approved the school district's request and denied a stay of his Order. The 5th Circuit

likewise denied a stay pending appeal. The 5th Circuit noted the district court's

approval of the motion notwithstanding the fact that the new site selected would

require several hundred additional black students to be transported by bus than in the

previous year. The court framed the issue of the scope of a court's review as follows:

> The scope of justiciability in school desegregation cases goes to
> questions of implementing the conversion of school systems from dual to
> unitary status, and to preventing the recurrence of the dual school
> structure.[11]

Finding that the school district's request would enhance the progress of the

desegregation of the Mobile schools overall, the 5th Circuit affirmed.

6.      While not a 5th Circuit case, *Davis v. Board of Education of the North

Little Rock Arkansas School District*[12] is so close to the instant case on its facts that it

bears citation. There the school district, which had been operating under a plan of

desegregation for a number of years, sought permission to revise its desegregation

plan by closing one of its schools. The motion was opposed by the plaintiffs on the

grounds that it would place a disproportionate transportation burden on black students

and because it would mean the closing of the only junior high school in the black

neighborhood. The school proposed to be closed was the 7th grade center for the

entire school district. It was conveniently located for the black students, but distant

---

[11] Id. at 1022
[12] 674 Fed. 2nd 684 (8th Circuit, 1982)

from the residential area of the white 7th grade students. It was on that basis that the plaintiffs opposed the plan. It is important to note that there was no claim that the change in the plan would affect the racial composition of the school district. The same is true in the case at bar. The court found that there were valid non-racial reasons for the closing of the school based upon its declining enrollment. That enrollment had declined by 24% in the 10 years since the imposition of the desegregation plan. The enrollment of the Batesville School has declined 30% since the implementation of the Uvalde Plan. On the basis of that declining enrollment and the administrative difficulties caused by it as well as decreased funding, both the district court and the court of appeals approved the amended plan. The analogies between the *Davis* case and the case at bar are significant. Declining enrollment at the Batesville School has contributed to the impracticability of teaching all of the courses at the Batesville School that are offered at Uvalde Junior High. Likewise, minority students, i.e. Latinos from the Batesville School will be bused to Uvalde. There is not here, however, the concomitant factor that Anglo students will be more conveniently served by the implementation of the School District's Plan. It will not impact the Anglo 7th and 8th grade students in the school district other than those few who are in the Batesville School (1.1%).

7.     Plaintiff's counsel repeatedly stated at the hearing that UCISD had the burden to prove that it had complied with the desegregation Plan in good faith and that it had failed to do so. While UCISD does not shirk from its good faith in the

implementation of this desegregation plan over the past 31 years being tested, it does submit that "good faith compliance" is not an element to be considered in a motion to modify the plan.  It is a consideration to be considered in a motion to dismiss an entire case.  None of the court of appeals or district court cases from the 5th Circuit mentioned good faith as an element in such cases.  However, if this School District has not been in good faith compliance with the plan, how can Plaintiffs explain their silence over the past 31 years, manifested by their absolute failure, until now, to raise any objection in this Court, to the way in which this school administration has brought about the desegregation of the UCISD.  Plaintiffs appear to focus their claim of lack of good faith compliance in the operation of the school district since the 2002 Order which allowed the implementation of the District of Choice Program.  That Order was signed in July, 2002.  Judge Biery's Order was styled as an "Interim Order" because, in it, he granted UCISD's Motion "on an interim basis".  He went on to specifically provide: "In the meantime, if Plaintiffs wish to raise any concerns or complaints about the new plan, Plaintiffs may, after an appropriate time to see how the plan works, file a motion for re-evaluation."  No such motion was ever filed.  If the Plaintiffs actually believe now that UCISD has not acted in good faith in its attempts to implement the District of Choice Program, why haven't they accepted this Court's invitation to "raise any concerns or complaints about the new plan" for five years?  Their silence speaks volumes.  Their objections now manifest a political, not a discrimination dispute.

8.     It is apparent therefore that the Court's consideration of UCISD's

Motion should be based on an inquiry about and determination of the question of

whether the requested pupil assignment change would have a negative impact on the

desegregation of the students in the UCISD.  It is respectfully submitted that there is

absolutely no claim or proof that such a result will be brought about by the assignment

of the Batesville School's 7th and 8th grade students to the Uvalde Junior High School.

OPTIONS

**Upgrade Issue**

9.     UCISD respectfully submits that in the present posture of this case, the

Court has no jurisdiction to "order an upgrade" of the 7th and 8th grade curriculum in

Batesville School.  This is so because there has been no claim, nor evidence in this

proceeding of ethnic discrimination; i.e. constitutional violations of the rights of the

7th and 8th grade students in Batesville School by reason of their **ethnicity** put forth by

the Plaintiffs.  Undersigned counsel is assuming that by the term "order an upgrade"

the Court was referring to ordering that UCISD conduct essentially the same courses

at Batesville School as those conducted at Uvalde Junior High.  The evidence in this

case shows that a number of courses offered at Uvalde Junior High were offered at

Batesville School, but not conducted there because there were never enough

Batesville School students who requested such courses and therefore those classes

were not "made up". (Record at 94-100, 207-208 & 214).  For that matter, there is

absolutely no evidence in this record that any parent ever requested that a particular

8

course be taught to his 7th or 8th grade student at Batesville School and that UCISD refused to do so.

10.    That being said, the question then turns on whether or not, in the absence of such a claim, the court has any jurisdiction to require curricula changes and the like at Batesville School.  The law in support of these jurisdictional concepts is well settled.  One need only go back to the origin of the current body of law concerning school desegregation to see that the equitable powers of the court, i.e. making orders concerning student assignment, building construction or improvement, student transportation, faculty assignment and the like, can only be issued upon findings of constitutional violations and should be tailored to the nature and extent of such violations. The genesis of this concept is found in *Brown I*[13] and *Brown II*.[14]  We all know, of course, that in *Brown I,* the Supreme Court, for the first time, held that in the field of public education the doctrine of "separate but equal" has no place and that state mandated segregation of minority pupils is unconstitutional because it deprives those students of the equal protection of the laws guaranteed by the Fourteenth Amendment[15]. At that time, the Court withheld ruling on the appropriate remedy that should be imposed to deal with previously segregated educational institutions.  The Court directed the parties to present further briefing and arguments on the questions of: (1) whether the Court should order that minority children forthwith be admitted to

---

[13] 347 U.S. 483 (1954)
[14] 349 U.S. 294 (1955)
[15] 347 U.S. at 495

the schools of their choice or, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems and, further: (2) if the local courts should formulate detailed decrees, what issues should be addressed in those decrees; should the Supreme Court appoint a special master to hear evidence with regard to the specific terms of such decrees; or should the Court remand the cases to the trial courts to frame decrees and what procedures should the trial court follow in arriving at the specific terms thereof?[16]

11.     In *Brown II*, a year later, the Court determined that it should remand the cases back to the trial courts for the formulation and implementation of proper plans for the desegregation of previously segregated school systems.  In doing so the Court observed that the underlying authority for the operation of school systems lies with the local authorities, but that the trial courts should monitor that authority in order to insure the eradication of unconstitutional discrimination.  In that regard the Court stated:

> Full implementation of these constitutional principles may require solution of varied local school problems.  School authorities have the primary responsibility for **elucidating, assessing, and solving these problems**; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing **constitutional principles.**[17]  (emphasis added.)

---

[16] Id. at 496
[17] 349 U.S. at 299

12.    In giving direction to the trial courts, the Court in *Brown II* also

recognized the necessity of the courts working with school administrators in the

creation and implementation of desegregation plans.  On that subject, the Court stated:

> To that end, the courts may consider problems related to administration,
> arising from the physical condition of the school plant, the school
> transportation system, personnel, revision of school districts and
> attendance areas into compact units to achieve a system of determining
> admission to the public schools on a nonracial basis… They will also
> consider the adequacy of any plans the defendants may propose to meet
> these problems and to effectuate a transition to a racially, non
> discriminatory school system.[18]

13.    Thus, at the very beginning of this new era of constitutional law

following the Supreme Court's rejection of the "separate but equal" doctrine, it has

been made clear that the authority of the federal courts is to remedy constitutional

violations; i.e. ethnic discrimination in public education.  The Supreme Court in

*Brown II* did not intend and has never thereafter held that the federal courts should

intervene in the operation of public school systems; telling those school officials what

to do or how to do it, ***in the absence of finding that such orders are necessary to

bring the school system into constitutional compliance; i.e. a non-discriminatory

program.***

14.    These concepts could not have been made any more clear than they were

in the Supreme Court's opinion, almost forty years later, in *Freeman v Pitts.*[19]  In the

*Freeman* case the Court was dealing with the application of DeKalb County, Georgia

---

[18] Id. at 300-301
[19] 503 U.S. 467 (1992)

school system for the dismissal of its desegregation case, either in whole or in part.

This occasioned the Court to discuss the remedial powers of the federal courts in

desegregation cases and the basis for them.  Several statements by the Court in that

case clearly show that in the absence of a constitutional violation that creates a

discriminatory condition in the school district, the courts have no authority to remedy

that condition:

> The essence of a court's equity power lies in its inherit capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries cause by **unlawful action.**  …In this respect, as we observed in *Swan,* "A school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair **the denial of a constitutional right.**  The task is to correct, by a balancing of the individual and collective interests the condition that **offends the Constitution.**"[20] (emphasis added.)
>
> ***
>
> This discretion (of the court) derives both from the **constitutional authority which justified its intervention in the first instance** and its ultimate objectives in formulating the decree.  The authority of the court is invoked at the outset **to remedy particular constitutional violations.** In construing the remedial authority of the district courts, we have been guided by the principals that "judicial powers may be exercised **only on the basis of a constitutional violation,**" and that "the nature of the **violations** determines the scope of the remedy" (Quoting from *Swan*[21].) A remedy is justifiable **only** insofar as it advances the ultimate objective of alleviating the **initial constitutional violation**. (parenthesis and emphasis added.)
>
> We have said that the court's end purpose must be to **remedy the violation** and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.  (Citing *Milliken v Bradley*[22])[23]. (emphasis added.)

---

[20] Id. at 487
[21] 402 U.S. at 16 (1971)
[22] 433 U.S. 267, 280-281 (1977)
[23] 503 U.S. at 489

***

[Desegregation] decrees, we have said, "exceed appropriate limits if they are aimed at eliminating a condition **that does not violate the Constitution or does not flow from such a violation**". (Quoting from *Board of Education of Oklahoma City Public Schools v. Dowell*[24]) (emphasis added.)[25]

***

We must soon revert to the ordinary principals of our law, of our democratic heritage and of our educational tradition: that Plaintiffs alleging equal protection **violations must prove intent and causation** and not merely the existence of racial disparity (Citing *Bazemore v. Friday*[26])[27] (emphasis added.)

15.     This jurisdictional requirement was very recently and succinctly stated by Judge Wayne of the Eastern District of Texas in his opinion in the case of *United States of America v. State of Texas*[28]  At footnote 9, Judge Wayne stated simply that:

> The complaint must state a cause of action created by federal law or it must assert a state law cause of action requiring the "resolution of a substantial question of federal law". (Citing authority.)

The Rule therefore is straight forward: no constitutional violation – no equitable remedy.

16.     It is therefore clear that in the absence of any allegations and probative evidence that the disparities between the curriculum being taught to the 7th and 8th graders at Batesville School as compared to that being taught at Uvalde Junior High is a result or vestige of prior ethnic discrimination, this Court has no jurisdiction or

---

[24] 498 U.S. 237, 247 (1991)
[25] 503 U.S. at 502 (J. Scalia, concurring)
[26] 478 U.S. 385 at 407-409 (1986)
[27] 503 U.S. at 506 – J. Scalia (Concurring)
[28] 2005 WL 1868844 (ed. Tex. 2005)

authority to order that additional or other courses <u>be taught</u> to the 7th and 8th grade students at Batesville School.

17.     While it is true that the Batesville School campus has a slightly greater percentage of Latino students than that of the district as a whole, (95.4% versus 87%; a difference of 8.4%)[29] it can hardly be suggested that that fact standing alone necessitates any remedial action to be taken on the Batesville School campus.  The disparity between the Latino student percentages in the four elementary schools in 1973 (between 97.2% and 31.3%) was the basis used by the 5th Circuit for finding that the Latinos had been denied the equal protection guaranteed by the Fourteenth Amendment and that it was necessary that a desegregation plan be put in place in the UCISD.[30]  In those days the 5th Circuit held in all cases that a deviation greater than 15% required remedial action.[31]  That law has now evolved even further as evidenced by the U. S. Supreme Court decision about one month ago which held that a desegregation plan which had as its underlying goal the achievement of racial balance in each school is one which "…this Court has repeatedly condemned as illegitimate."[32]  The foregoing analysis may not even be necessary in view of the fact that the Plaintiffs are not contending that the absence of duplicate programs at the 7th and 8th grade levels in Batesville School and at Uvalde Junior High is evidence of discrimination.  The closet thing that Plaintiffs have said to suggest a constitutional

---

[29] UCISD's Amended Desegregation Report filed with the Court on or about June 22, 2007.
[30] *Morales v. Shannon* 516, Fed 2nd 411 at 412-413 (5th Circuit, 1975)
[31] *Singleton v. Jackson Municipal Separate School District*, 419 Fed. 2nd 1211 (5th Circuit, 1969)
[32] *Parents Involved in Community Schools v. Seattle School District I*, - S.Ct. -, 2007WL, 1836531 (June 28, 2007)

violation is their argument that the transfer of the 7th and 8th grade students from Batesville School to Uvalde Junior High "substantially burdens Latino students".[33] The fact is that *every* decision or action taken by UCISD "substantially burdens (or effects) Latino students" because 87% of all students in the school district are Latino. Accordingly that argument cannot present a constitutional violation; i.e. ethnic discrimination.

18.    It is true that a vocal number of Batesville School residents and school children parents may, in good faith, believe that the 7th and 8th graders should not be assigned to Uvalde Junior High.  However, that argument has no place in this case. This Court can only deal with constitutional rights and fashion the proper remedy if UCISD is violating those rights. To accept an argument to the contrary would lead to ridiculous results.  For example, what if all of the Batesville School parents and other residents should sign a petition directed to the UCISD Board demanding that high school classes; i.e. 9th through 12th grades, be provided at the Batesville School.  It is undisputed that the Batesville School has apparently never had high school classes, even when it operated as an independent school district (before 1973) or thereafter; those students have always traveled to Uvalde to attend the Uvalde High School.  This arrangement was carried forward in the original Desegregation Plan promulgated by this Court in 1976.  If the idea to upgrade curriculum at Batesville School has any merit, a demand that high school classes be offered in Batesville School would have

---

[33] Plaintiffs Response in Opposition to Defendant's Motion for Modification for Decree at page 6)

more.  In the case of high school students, Plaintiffs could argue, not that the high

school curriculum in the Batesville School is inferior to that in Uvalde, but that it is

non-existent in the Batesville School; all the more reason why, they could argue, the

School District should provide high school classes in Batesville School.  Without a

claim that the failure to provide high school classes in Batesville School is a vestige of

prior ethnic discrimination in violation of the Constitution, surely no one could argue

that the Court would be authorized to tell UCISD to build a high school and staff it at

Batesville for about 80 students.

19.     It is undisputed that the curriculum taught to 7th and 8th graders at

Batesville School does not measure up to the curriculum offered to them at Uvalde

Junior High.  Dr. Brown has explained the good and sufficient reasons for that

difference; i.e. that there are not enough children in the 7th and 8th grades in Batesville

School (about 16 or 17 each) to justify teaching advanced college preparation courses

and the like because it is totally impracticable to provide such classes for 1, 2, or 3

students. (Record at 23-26, 29, 41-42 & 71-72).  The demographic change in the

Batesville community has been significant and has impacted the ability of UCISD to

provide a greater breath of curriculum at Batesville School.  In 1976, when the

Desegregation Plan was implemented by this Court, the total enrollment at the

Batesville School was 277, of which 90% were Latino.[34]  At the close of the 2006-

---

[34] Desegregation Plan attached to June 29, 1976 Decree at page 11

2007 school year, the total enrollment at Batesville School was 198[35], a decrease of 30% of the Batesville School student body.  There is no pleading or evidence by the Plaintiffs that this demographic change was in any way caused by the pre-1973 discriminatory operation of the School District.  In the absence of any such pleading and proof, the Court should not make any orders for changes in school district operation that might be required by reason of such demographic changes and the Supreme Court has specifically so held in *Freeman v. Pitts*.[36]

20.    It is to be borne in mind that Batesville School is only one of 9 campuses in the entire UCISD.  What if one of the other campuses; such as Anthon Elementary, should, through its parents' organization, demand that it receive an equal number of library books to those available at the other elementary campuses.  Would this Court have the authority to enter such an order against the school district absent a basis rooted in constitutional law, i.e. in order to remedy a constitutional violation?  It is respectfully submitted that the answer to that question is a resounding NO.

21.    The Plaintiffs' argument that UCISD's obligation to enhance the curriculum for 7th and 8th graders in Batesville School appears to be based on a claim that the UCISD has not implemented the Interim Order of Modification of its Desegregation Plan which was entered in 2002.  That claim is not true.  In 2002, the District wished to implement the Uvalde Regional School District of Choice Program.

---

[35] Amended Desegregation Report filed June 21, 2007
[36] 503 U.S. at 495-496.  To the same effect see also *Manning v. School Board of Hillsboro County, Florida*, 244 Fed. 3rd 927 (11th Circuit, 2001)

That program was designed and intended to attract students from other school districts into the UCISD at all schools, including Batesville School. (Second Motion for Modification of Decree at paragraph 5). That proposed change required a modification of the Decree which originally would not allow Batesville School students to attend Uvalde Junior High nor would it allow Uvalde Junior High students to attend school in Batesville School. The Motion referenced "special curricula" at Flores Elementary and Batesville School that would be available upon the implementation of the Program. Plaintiffs go on to argue that after this Court authorized Batesville School students in grades 5-8 to attend Flores Elementary or Uvalde Junior High, no "special curricula" was implemented at Batesville School. The creditable evidence in this case shows that that contention is not correct. While it is true that some, if not many, of the courses presently offered at Uvalde Junior High have not been <u>implemented</u> at Batesville School, it does not follow that those courses were not <u>offered</u> at Batesville School. Dr. Brown has testified that since the 2002 Order, courses over and above core curriculum have been available at Batesville School, but there have never been enough students either from Batesville School itself or from the outlying districts or the Uvalde Junior High to warrant conducting classes in all of those courses. (Record at 207-208). Plaintiffs have offered no evidence whatsoever that any Batesville School student, or his parent, has previously requested that a particular "special curricula" course be made available to him there and been denied such a request. It is true that while Ms. Rodriguez has testified that it would be

a simple matter to simply train and assign teachers to Batesville School qualified to give instruction in these advanced courses, she has admitted that she has no experience or expertise in the area of school district faculty staffing and the like. While it may be a utopian goal to provide a teacher and a classroom to teach any course at Batesville School that is taught at Uvalde Junior High, that laudable principle must be tempered by rules of reason. This is where the expertise of the school administrators should be given deference by the Court. Throughout the advancement of the desegregation process in the schools in this country, courts have repeatedly recognized that they should not undertake to act as school administrators and direct specific actions by the school district except as necessary to guarantee constitutional protection. More than 30 years ago the 5th Circuit court stated:

> We must never conclude that federal district judges are actually school superintendents who enter office by a slightly different route and discharge certain additional responsibilities. As the Supreme Court cautioned in *Swan*, "it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults"[37].

22.    The case of *Monteilh v. St Landry Parish School Board*[38] is also instructive on this point. There, in considering the issue of whether or not a new school should be constructed in a location selected by the school administration, the court stated:

---

[37] *United States v. Hendry County School District*, 504 Fed. 2nd 550 at 554 (5th Circuit 1974)
[38] 848 Fed. 2nd 625 at 632 (5th Circuit 1988)

Second, federal courts lack the expertise and competence needed to dictate to school boards the location of new schools and the drawing of attendance zones. Location of a school comes within the purview of the federal courts only to the extent that it has an impact on desegregation.

23.   To the same effect Judge Gibson of the Southern District stated, in the case *of Smiley v. Blevins* the following:

Nevertheless, the case for displacement of local authority by federal court in a school desegregation case is a limited one, and the scope of any equitable remedy imposed by the court has been carefully circumscribed. The controlling principle consistently espoused by the Supreme Court in its seminal decisions in this area is that "the extent of any equitable remedy is determined by and may not properly exceed the effect of the constitutional violation." (Citing *Austin Independent School District v. United States*[39])[40]

24.   Accordingly it is respectfully submitted that given the current state of the pleadings and the evidence in connection with the UCISD Motion, this Court should not order any change of the Batesville School curriculum because it has no jurisdiction to do so.

**To Grant or Deny the Motion to Modify**

25.   There is no constitutional reason to deny the Motion. There has been no evidence submitted nor any claim made that the decision for the mandatory attendance of the 7th and 8th grade Batesville School students at Uvalde Junior High is in any way motivated by any constitutionally prohibited motive, i.e. ethnic discrimination. Nor is there any claim that such requirement would result in any constitutionally prohibited

---

[39] 429 U.S. 990, 995 (1976)
[40] 554 Fed. Supp. 1248 at 1254 (S.D. Tex. 1981)

segregation-in-fact of the Latino students from Batesville School; any other constitutional violation; or retreat from the desegregation process that has been in place in Uvalde for 31 years.  In fact the statistical evidence is to the contrary. Currently, the Batesville School (all grades) shows a Latino population of 95.4%. Currently the Uvalde Junior High School shows a Latino population of 82.7%.  If the thirty-eight 7th and 8th grade students from Batesville School are placed in the Uvalde Junior High this year, the Latino percentage of the Uvalde Junior High would become 83.7%; i.e. 1% more than it is presently.  The net result would be that, assuming that all of the 7th and 8th grade students in Batesville School are Latino (which is not certain), by placing them at Uvalde High School they would be moving into a more, not less, ethnically diverse school environment.

26.     By leaving the 7th and 8th grade students at Batesville School, the Court would be denying them the opportunity of an enhanced curriculum and a greater opportunity for achievement than they presently have.  Such a decision would also leave them in a slightly more Latino populated school than they would be in at Uvalde Junior High.  While it is true that Batesville School students have been free to transfer to Uvalde Junior High or Flores since 2002 and some of them have taken advantage of that change, a significant number have not. (Record at 17.)  Whatever the reasons for that phenomenon may be, they cannot be attributed to the school administration or Board.

## APPEALABILITY

27.    None of the 5th Circuit opinions cited herein reflect the mechanics of the

appeals that brought before them decisions of the district court on motions to modify

and the like where there was no final judgment in the district court disposing of all of

the parties and all of the issues.  Typically these cases arise in the circumstance where

the district court, as here, has maintained jurisdiction in the case and is called upon

from time to time to enter orders relating to the Desegregation Plan.  Defendants

suggest that 28 U.S.C. Sec. 1292 (a) (1) allows an appeal from such an interlocutory

order as the Court will enter in response to UCISD's Motion.  The original

Desegregation Decree is in reality an affirmative injunction in that it directs that the

UCISD "shall implement the Plan of Desegregation heretofore filed by them in this

Court on or about the 7th day of November, 1975".  The cited section of course, allows

appeals from interlocutory orders "granting, continuing, modifying, refusing or

dissolving injunctions".  The Order to be entered by the Court, however it should rule

on the Motion, would qualify as an appealable Order under that section of the Code.

## CONCLUSION

28.    In closing, it is important to note that since the implementation of the

Desegregation Plan in 1976, there has never been any complaint filed with this Court

by the Plaintiffs or anyone else concerning the implementation and operation of that

Plan by the UCISD authorities.  When the other two modifications of the Plan were

sought in 1975 and 2002, the Plaintiffs filed no papers with the court seriously

opposing those modifications. The current reaction to this Motion to Amend the Plan

is the first complaint that the Plaintiffs have made through the 31 year progress of the

desegregation process that has been carried on in this School District. This Court

should give great deference to that fact as did the 5th Circuit in the case of *Flax v.*

*Potts*[41]. There the district court had declared the Ft. Worth School District to be

unitary and relieved it from further court supervision. The Court of Appeals affirmed

that decision with the following statement that is especially appropriate in the Uvalde

case:

> Furthermore, this Court stressed in an earlier opinion in this case that
> **deference** (to the school administration) is also "**particularly**
> **appropriate** where, as here, the implementation of the Desegregation
> Plan has continued for 15 years without any allegations of intentional
> segregation on the part of the FWISD. In fact, the School District has
> been commended many times by the courts for its dedication to the
> elimination of inequity in its schools." (emphasis and parenthesis
> added.)[42]

The implementation of the Uvalde Desegregation Plan has continued for twice as long

as that of Ft. Worth at that time, without objection. Therefore deference by this Court

to the educational decisions of the school administration should be even more

"**particularly appropriate**" and the Court should grant the UCISD's Motion for

Modification.

---

[41] 915 Fed. 2nd 155 (5th Circuit 1990)
[42] Id. at 158

Respectfully submitted,

THE COOK LAW FIRM

By: _____
     Grant Cook
     State Bar No. 04732000
     5005 Riverway, Suite 210
     Houston, Texas  77056
     (713) 552.0700
     (713) 552.1610 Fax

     ATTORNEY OF RECORD FOR
     Uvalde Consolidated Independent
     School District

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing motion has been sent to the attorney s of record for the plaintiff by Federal Express this ___2d___ day of August, 2007.

Grant Cook