UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
DEL RIO DIVISION



GENOVEVA MORALES, et al.,  §
    Plaintiffs,                 §
                                     §
v.                                     §          CAUSE NO. DR-70-CA-14
                                     §
E.P. SHANNON, et al.,          §
         Defendants.          §

## ORDER

This school desegregation case began in 1970. The matter presently before the Court is the motion of defendant Uvalde Consolidated ISD for partial modification of the 1976 decree that would permit it to consolidate all seventh and eighth graders in the district in a single school. (Docket no. 110.) While the District has also requested dismissal of the case, due to the impending start of the new school year and the plaintiffs' desire to conduct further discovery on the District's dismissal request, the parties request that at this time the Court rule only on the District's request for partial modification.

### Background.

Plaintiffs brought this suit contending that Mexican-American elementary students in Uvalde, Texas had been subjected to segregation on the basis of race. This Court, in an order signed by Judge John H. Wood, Jr., initially found no segregatory intent with respect to student assignment. The Fifth Circuit reversed that order on appeal, finding segregatory intent on the part of the District with respect to student assignment of Mexican-American students in the District's elementary schools. Morales v. Shannon, 516 F.2d 411, 413 (5th Cir. 1975). Because the district had only one junior high school and one high school, the desegregation issue was limited to the elementary schools in the district. Id. at 412.

After the suit was filed and before the entry of the original decree in 1973, the District consolidated with the Batesville School District. Batesville is a small community about 20 miles from Uvalde that had historically operated as a separate district having only one school. Prior to consolidation, all high school students in Batesville attended the high school in Uvalde, and this state of affairs continued following consolidation. Students in grades K through eighth continued to attend the Batesville School.

Following remand from the Fifth Circuit, Judge Wood signed a decree on June 28, 1976 (docket no. 59) finding that intentional segregation and denial of equal educational opportunity had been practiced on Mexican-American students. The Court ordered the District to implement the desegregation plan it had filed, including a bilingual-bicultural plan filed by the District as an appendix. The decree contained specific orders concerning classroom seating; racial composition, assignment, and selection of professional staff; and the transportation system. In addition, the decree required that all school construction, consolidation, and site selection

> shall be done in a manner which will prevent a re-occurrence of a dual school structure and, further, shall be planned and carried out so as to achieve the objective of promoting the continuing complete desegregation of the School District.

Decree at 5. Finally, the decree set requirements for annual reports to be filed by the District on April 15 of each year. The Court retained jurisdiction of the case for all purposes until the Court finds that a dual system will not be or tend to be reestablished. The Court retains jurisdiction to this day.

The last time the parties came to court was in 2002 when the District filed a motion to modify the decree. (Docket no. 97.) According to the motion, the District had recently adopted a School District of Choice program to encourage students within the district and in neighboring

districts to attend schools offering special curricula, including the Batesville School. In addition, the program would allow students from other districts to transfer to the Uvalde junior and senior high schools. The program was designed to attract students by offering "core curriculum instruction, enriched academic courses, specialized curriculum, instructional strategies, and/or additional curricular, co-curricular or extracurricular activities." (Docket no. 97 at 4.) Plaintiffs filed no motion in opposition to the District's motion, and Judge Fred Biery granted the motion with an "Interim Order of Modification" signed July 26, 2002. (Docket no. 104.) The Interim Order modified the decree

> by allowing students in the elementary and junior high schools in Uvalde Consolidated School District to participate in the District of Choice Program by attending the Batesville School and furthermore to allow the students currently attending the Batesville School the opportunity to participate in the program by attending the ... Uvalde Junior High School. This, of course, is done in the good faith belief that the Uvalde school officials will comply with the spirit of the original desegregation decree that no child should be discriminated against.

Interim Order of Modification at 2.

## Law.

Until a school system achieves unitary status, it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct. Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 437-38 (1968). To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system. Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir. 1992). The school district bears the burden of showing that its proposed action comports with the decree. Freeman v. Pitts, 503 U.S. 467, 494 (1992); Moses v. Washington Parish School Bd., 379

F.3d 319, 327 (5th Cir. 2004). When a school board proposes to close a school facility with a predominately minority student body, it must "adduce evidence sufficient to support the conclusion that [its] actions were not in fact motivated by racial reasons." Arvizu v. Waco Indep. Sch. Dist., 495 F.2d 499, 505 (5th Cir. 1974); see also United States v. Hendry County Sch. Dist., 504 F.2d 550, 554 (5th Cir. 1974) ("[T]he School Board of such a [formerly dual] system must demonstrate that the new construction will not tend to promote such a relapse [into segregation].").

Until a desegregation order is dissolved, the district court has a constitutional duty to enforce the order by scrutinizing all school board actions. Hull v. Quitman County Bd. of Educ., 1 F.3d 1450, 1458 (5th Cir. 1993). "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." Board of Educ. of Oklahoma City Public Schs. v. Dowell, 498 U.S. 237, 249-250 (1991). See also Hull, 1 F.3d at 1454 (applying this test to the decision to close a school by a district subject to a desegregation order). Moreover, in reviewing the District's request, the Court recognizes that "local autonomy of school districts is a vital national tradition." Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977). See also Hull, 1 F.3d at 1454 (local control is a consideration in reviewing whether a school district's action comports with the goals of the decree).

### The District's request.

The District asks that the Court modify the decree to permit the District to mandate that the seventh and eighth grade students in Batesville attend the Uvalde junior high school "for a variety of reasons not the least of which is the inefficiency of operating seventh and eighth grades

4

in two separate school locations." (Docket no. 110 at ¶ 17.) The District indicates that the purposes of requiring the Batesville seventh and eighth grade students to attend the Uvalde junior high school are to "expand the academic, extra curricular and social opportunities of those students and at the same time mak[e] a transition for those students to Uvalde much easier for them." Id. at ¶ 19.

There are approximately 36 students in the seventh and eighth grades in Batesville. Tr. 29. Approximately 674 students attend the Uvalde junior high school. UCISD Revised Status Report, docket no. 111. The District's superintendent, Dr. Wendell Brown, testified at the hearing that the Batesville seventh and eighth grade students are taught only the basic level courses at the Batesville school. Tr. 21, 90. This is due primarily to the number of students and the size of the staff. Tr. 21-22, 97. Dr. Brown also testified that a class that is offered will not be taught unless a minimum number of students requests it. Tr. 90-94. The purpose of the transfer is to provide the Batesville students with access to the more advanced courses and extra-curricular activities offered at the Uvalde junior high school that will help them prepare for college and maximize their educational opportunities. Tr. 21, 34-35, 85-86, 205. At Uvalde, the Batesville students will have access to pre-advance placement courses in English, Math, Science, and Social Studies, along with fine arts and computer classes, choir, band, and a viable athletic program. Tr. 21, 24, 93. In addition, Dr. Brown testified that the younger seventh and eighth grade students will have an easier time assimilating into the Uvalde schools than if the transition is made in the 9th grade. Tr. 26, 32, 208-12. This evidence supports the conclusion that the District's transfer plan was not in fact motivated by racial reasons. Arvizu, 495 F.2d at 505. Rather, it was to provide the Batesville seventh and eighth grade students with the best


educational opportunities the District can provide.

Two parents of Batesville students testified at the hearing in opposition to the transfer plan. There was evidence that many more Batesville residents also oppose the plan. The Court sympathizes with those parents in Batesville who do not want their seventh and eighth grade students bused 20 miles to Uvalde. The Court understands their concerns and is confident that they have the best interests of their children at heart. But as counsel for the District so accurately pointed out, this Court is not an educator, and the courts are not permitted to inject their personal views on educational policy. As the Fifth Circuit has said:

> federal courts lack the expertise and competence needed to dictate to school boards the location of new schools and the drawing of attendance zones. "Location of a school comes within the purview of the federal courts only to the extent that it has an impact on desegregation."

Monteilh v. St. Landry Parish Sch. Bd., 848 F.2d 625, 632 (5th Cir. 1988) (quoting United States v. Perry County Bd. of Educ., 567 F.2d 277, 280 (5th Cir. 1978)).

It thus makes no difference how I may personally view the District's plan. Whether I think it is wise or foolish is of no consequence. I must follow the law as established by the United States Supreme Court and Fifth Circuit Court of Appeals. That law strictly limits my review of this matter to whether the District's proposed plan violates the Constitution. The Court's remedial authority in desegregation cases

> derives both from the constitutional authority which justified its intervention in the first instance and its ultimate objectives in formulating the decree. The authority of the court is invoked at the outset to remedy particular constitutional violations. In construing the remedial authority of the district courts, we have been guided by the principles that judicial powers may be exercised only on the basis of a constitutional violation, and that the nature of the violation determines the scope of the remedy. A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation.

Freeman, 503 U.S. at 489 (quotation marks and citation omitted).

When the present case reached the Fifth Circuit, that court found that the neighborhood assignment system in the 1950s and 1960s for the Uvalde elementary schools "froze the Mexican-American students into the Robb and Anthon [elementary] schools." Morales, 516 F.2d at 413. In addition, the freedom of choice assignment plan applicable to the students in the rural areas of the district resulted in a majority of rural Anglo students opting for the Dalton school, the only predominantly Anglo elementary school in the district. Id. These facts were the basis for the Fifth Circuit's finding of segregatory intent, the constitutional violation that required the district court to fashion a remedy. Id. Thus, the desegregation issue in this case has concerned desegregation in the elementary schools in the district, initially the four Uvalde elementary schools, and then including the Batesville elementary school following consolidation. Id. at 412. It is uncontested that the District's plan to consolidate the district's junior high students in the Uvalde campus will have absolutely no impact on the racial balance of the elementary schools.

Nor will the plan promote segregation of the junior high school students. The racial make-up of the students within the district is strictly a matter of where their families live. The district as a whole is predominantly Latino. Population changes in the district, including changing demographics and concentrations of racially or ethnically identifiable residents in particular geographical areas of the district, are beyond the control of the school district. Hull, 1 F.3d at 1454; Ross v. Houston Indep. Sch. Dist., 699 F.2d 218, 288 (5th Cir. 1983). The United States Supreme Court has emphasized that "the Constitution is not violated by racial imbalance in the schools, without more." Milliken v. Bradley, 433 U.S. 267, 280, n. 14 (1977). The District's plan will have very little impact on the racial make-up of the seventh and eighth grades

in the Uvalde junior high school. Indeed, as the District points out, the Batesville students will experience a somewhat more diverse student body in Uvalde because the percentage of non-Latinos there will be higher, however slightly. If the present Uvalde junior high school students will experience a slightly less diverse student body after the transfer, that is a result of demographics, not segregatory intent.

In Hull, the Fifth Circuit stated that there is "no hard and fast rule preventing legitimate school closings." 1 F.3d at 1455. The only requisite is that the decision must not be used to reestablish segregation. Id.; see also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 21 (1971) ("it is the responsibility of local authorities ... to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system"). Again, there is absolutely no evidence before the Court and the Court has no reason to suspect that the District's transfer plan is an effort to re-segregate Latino students.

The Supreme Court has long championed local control of school districts. In San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 50 (1973), the Court observed that local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence." See also Milliken v. Bradley, 418 U.S. 717, 741-42 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."). Local control also promotes accountability to the citizens of the district. As the Supreme Court in Freeman stated,

>Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course.

Freeman, 503 U.S. at 490. As long as the District's action does not violate the Constitution by perpetuating or reestablishing segregation, it is up to the local school board to determine how best to educate its students. Whether the District should provide "special curricula" at Batesville or educate Batesville students in Uvalde is a decision the District has to make as long as its decision engenders no constitutional violation. As indicated, there is no evidence of any segregatory intent. The transfer plan thus satisfies the mandate of the 1976 decree that school consolidation "be done in a manner which will prevent a re-occurrence of a dual school structure and ... to achieve the objective of promoting the continuing complete desegregation of the School District." Decree at 5.

### The plaintiffs' challenges.

#### Failure to comply with 2002 Interim Order.

Plaintiffs' primary argument in opposition to the transfer plan is that the District did not comply with Judge Biery's 2002 Interim Order because it failed to develop and implement the "special curricula" programs at the Batesville School referenced in the District's motion to modify. Plaintiffs argue that these omissions exhibit the District's lack of good faith compliance with the plan. Affidavits are attached to the plaintiffs' response and testimony was heard from parents of Batesville students detailing the lack of qualified teachers, the neglect of the Batesville School with respect to extracurricular programs, and the lack of a special curriculum program at the Batesville School to attract other students, including Anglo students, into the school.

Dr. Brown admitted that there is no special curriculum program offered at the Batesville School. Tr. 73-74. Although the district of choice program remains in place, no student from outside Batesville has chosen to attend seventh or eighth grade at the Batesville School. Tr. 196-99, 206-07. This is not surprising given the lack of any but the most basic curriculum at that school. Dr. Brown also admitted that there are inequities in the curricula offered to Batesville seventh and eighth grade students as compared to those offered at the Uvalde junior high school, which is what prompted him to propose the transfer program. Tr. 204-05. Thus, plaintiffs argue, the District has not complied in good faith with the desegregation decree. "Despite requesting and receiving this Court's permission to develop a special curricula program at the Batesville School, Defendants never established the special curricula program." Plaintiff's Post-Hearing Brief at 5.

The District did not need the Court's permission to develop special curricula at Batesville or at any other school. The Court does not oversee and approve course offerings at the various campuses. Judge Biery observed in the Interim Order that "[t]hese new educational opportunities would require a modification of the desegregation decree to allow the students to participate by attending school in physical locations that the present decree, written before these students were born, does not allow." Interim Order at 1-2. Thus, the Interim Order did not mandate that special curricula be established at Batesville, but only permitted students to attend other schools than the ones the decree required.

In addition, Judge Biery styled his order as an "Interim Order." His order specifically provided, "In the meantime, if Plaintiffs wish to raise any concerns or complaints about the new plan, Plaintiffs may, after an appropriate time to see how the plan works, file a motion for re-

evaluation." (Docket no. 104 at 2.) Judge Biery also urged that any problem that might arise be resolved by the parties "within the community at school board meetings by TALKING TO EACH OTHER" rather than spending taxpayer resources in court. (Id., emphasis in original.) Plaintiffs filed no motion for re-evaluation or any other complaint in the five years since Judge Biery's order. Indeed, plaintiffs have not complained to the Court that the District failed to comply with Judge Biery's order or with any other aspect of the decree until now. While the Court does not suggest that the plaintiffs are estopped from complaining about the District's previous lack of interest in the Batesville seventh and eighth grade students, the plaintiffs' inaction over the past five years, especially given Judge Biery's explicit invitation, suggests that they had no serious objections to the situation in Batesville prior to learning of the proposed transfer plan, or that they had worked out any problems through the political rather than the legal process.

It is undisputed that the Batesville seventh and eighth grade students do not have the academic opportunities available to the students at the Uvalde junior high school. The District is thus faced with two choices— either endeavor to commit the resources necessary to provide equal educational opportunities to the 36 seventh and eighth grade students at the Batesville campus, or transfer them to Uvalde where those opportunities presently exist. Dr. Brown testified that there have never been enough junior high students attending the Batesville School to offer the full range of courses that are available to the 674 junior high students in Uvalde. Tr. 207. From all the evidence, it appears that the lack of educational opportunity in Batesville is a matter of numbers rather than racial discrimination. The same situation would be applicable to the approximately 80 high school students from Batesville if they were not already being bused

to Uvalde.[1]

Burden on Latino students.

Plaintiffs' second argument in opposition is that if the District's motion is granted, the burden of busing the seventh and eighth grade students to Uvalde will fall primarily on Latino students. While true, it is a matter of demographics rather than an intention to segregate that makes this situation unavoidable. The demographics of the district are heavily Latino. The Batesville campus is currently 95 percent Latino. Tr. 84. The percentage of Latinos in the district as a whole is 87. UCISD Revised Status Report, docket no. 111. This simple demographic fact ensures that virtually every action the District takes will affect many more Latinos than non-Latinos. As indicated above, merely because this is so does not mean that the transfer plan is perpetuating the vestiges of past discrimination.

The Court concludes that the District has no duty to keep the seventh and eighth grade students in the Batesville School, a school housing five percent of the district's junior high students, when the transfer will not significantly impact the racial mix of the junior high school. Moreover, in the 30 years since the decree was entered, the plaintiffs have not until now complained to this Court that the District has violated the decree. Nor is there any evidence that the District's motivation in proposing the transfer of the Batesville students is to resegregate. Other than the additional time the students will have to spend on the 20-mile bus ride to and from Uvalde— the same bus ride already made by Batesville high school students— the plaintiffs have not shown that the students' education in Uvalde will suffer. Indeed, it is apparent that the

---

[1] Apparently the same does not hold true for the elementary students in Batesville. According to Dr. Brown, the K-6 model for educating elementary students is a sound model and applies in all elementary campuses throughout the district. Tr. 27-28.

Uvalde junior high school will open numerous educational and extracurricular opportunities to the Batesville students. While there was testimony that *some* of the educational opportunities available at Uvalde could be provided at Batesville, as long as the District's transfer plan does not violate its duty to avoid actions that would deliberately reinvigorate segregation, the District need not attempt "heroic measures" to comply with that duty. Hull, 1 F.3d at 1455.

The District's motion to modify the decree to permit it to transfer Batesville seventh and eighth grade students to the Uvalde junior high school (docket no. 110) is GRANTED. The District's alternative motion to dismiss contained in that same motion remains pending.

SIGNED this 9 day of August, 2007.

_____
ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE